**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MARGARET D. NEWTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-cv-01542 (RCL)** |
| | ) | |
| **OFFICE OF THE ARCHITECT OF** | ) | |
| **THE CAPITOL,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

<u>**MEMORANDUM OPINION**</u>

This case involves allegations of unlawful racial discrimination, hostile work environment and retaliation by the Office of the Architect of the Capitol ("OAC"). Before the Court is defendant's Motion for Summary Judgment or Judgment on the Pleadings. Def.'s Mot. [20], Nov. 8, 2011. Having carefully considered the motion, the opposition, the reply, the entire record in this case, and the applicable law, the Court will grant defendant's Motion. A review of the background of the case, the governing law, the parties' arguments, and the Court's reasoning in resolving those arguments follows.

I.   **BACKGROUND**

In April 2005, Iris Smith, a Caucasian GS-13 Human Resources Specialist, resigned from the OAC. Newton Decl. ¶ 4. The OAC subsequently advertised an employment vacancy for a "Human Resources Specialist (Employee Benefits), GS-0201-12." Def. Not. Filing Ex. 1 [21-1], at 1 ("Def. Ex."); Def. Statement of Material Facts Not in Dispute ¶ 2 ("Def. SMF"). The vacancy announcement listed the "promotion potential" for this position as "12." Def. Ex. 1 [21-1], at 1. The application deadline was April 29, 2005. *Id.*

On October 2, 2005, the OAC filled the vacancy by hiring plaintiff Margaret Newton, an African American.  Compl. ¶ 13; Def. SMF ¶ 3.  She was hired as a GS-12, Step 4, Human Resources Specialist in the OAC's Human Resources Management Division ("HRMD").  *Id.* Newton's previous employment was as a GS-11 Legal Administrative Specialist in the Office of Personnel Management.  Def. Ex. 9 [21-9], at 2.  This GS-11 position was her highest grade level position in the federal competitive service prior her appointment in the HRMD.  Def. SMF ¶ 4.

The names of the HRMD's various branches and its organizational structure prior to October 2006 are unclear from the record.[1]  It appears that the OAC hired Newton into the HRMD's Employee Benefits & Services Branch.  Def. SMF ¶ 3; Def. Ex. 1.  Newton's first-line supervisor during this time was Maria Wennersten, Chief of the Employee Benefits & Services Branch.  Compl. ¶ 14; Def. SMF ¶ 4.  The Employee Benefits & Services Branch also included Karen Bowman, a Caucasian GS-13 Human Resources Specialist, as well as support staff. Tiscione Decl. [21-1] ¶ 12.  Bowman retired on September 15, 2006, and her GS-13 position was eliminated.  *Id.* ¶ 13; Pl. Ex. 1 [22-1].

---

[1] According to former HRMD Chief Rebecca Tiscione, from the time Newton was hired until September 2006, Newton was employed in HRMD's "*Retirement & Benefits Services Branch*." Decl. of Rebecca Tiscione ¶ 12 ("Tiscione Decl.") (emphasis added).  In October 2006, a separate branch—the "Payroll & Benefits Branch"—was split to create the Employee Benefits & Services Branch and the Payroll & Processing Branch. Id. ¶ 14.  Therefore, according to Tiscione's Declaration, at least three separate branches existed in the HRMD after October 2006: Retirement & Benefits Services, Employee Benefits & Services, and Payroll & Processing.  Id. ¶ 14.

However, defendant's statement of Material Facts Not in Dispute contradicts Tiscione's Declaration.  Defendant states that "On October 2, 2005, Plaintiff entered employment with the Defendant as a GS-0201-12, Step 4, Human Resources Specialist in the *Employee Benefits & Services Branch* of the HRMD."  Def. Stmt. ¶ 3 (emphasis added).  Further, according to the April 18, 2005, Vacancy Announcement, Newton's position was "located in the Office of the Administrative Assistant, Human Resources Management Division (HRMD), Employee Benefits and Services Branch."  Def. Ex. 1.  The Court is at a loss at how to reconcile the OAC's evidence that Newton was hired in a so-called "Retirement & Benefits Services Branch," Tiscione Decl. ¶ 12, with other evidence that she was hired in the "Employee Benefits & Services Branch," Def. SMF ¶ 3, Def. Ex. 1, 8.

The Court draws attention to this confusion because it endeavors to accurately describe basic details of a case, such as the organizational structure of an office.  In this case, inattentive drafting has made that difficult.  Regardless, this confusion does not create a genuine dispute of material fact.

One month after Bowman's retirement, the HRMD was reorganized and Chief Wennersten became head of a different branch.  Tiscione Decl. ¶¶ 14–19.  Newton states that she was informed by Chief Wennersten that, pursuant to the reorganization, her "position would be reclassified as a 'GS-12/13 HR Specialist (Retirement)' career ladder[] position."  Newton Decl. ¶ 13.  One important attribute of a "career ladder" position, according to the HRMD Manual, is that it makes the incumbent eligible to be noncompetitively promoted to a higher grade.  Def. Ex. 7 [21-7], at 47.  The OAC disputes Newton's assertion that she ever held a "career ladder" position.  Def. Mem. in Opp'n 17–18 ("Def. Opp'n").  As explained later, Newton does not proffer sufficient evidence for a reasonable jury to believe that she held a "career ladder" position, therefore no genuine dispute of material fact exists.

Because of the HRMD reorganization and Chief Wennersten's transfer to a different branch, Newton reported directly to HRMD Director Rebecca Tiscione, who served concurrently as Acting Chief of the Employee Benefits & Services Branch from October 2006, until March 4, 2007.  Tiscione Decl. ¶¶ 18–19; Newton Decl. ¶ 14.  During this six-month period, Newton was the only permanent Human Resources Specialist employed in the Employee Benefits & Services Branch.  Def. SMF ¶ 7; Newton Decl. ¶ 8.

The parties dispute the type of work Newton performed during this six-month period.  Newton states that she performed GS-13 level work during this period.  Newton Decl. ¶ 16.  By contrast, OAC states that Newton never performed GS-13 level work and that the GS-13 work during this timeframe was "either not needed at the time, or performed by the new Branch Chief when she was hired."  Tiscione Decl. ¶ 18.  Again, as later explained, this dispute is immaterial.  On March 4, 2007, Rebecca Vento was hired as the new Chief of the Employee Benefits & Services Branch and became Newton's first-line supervisor.  Def. SMF ¶ 9.

In January 2008, Newton met with Director Tiscione and Chief Vento to request "a noncompetitive promotion" to the GS-13 level. Def. SMF ¶ 10; Newton Decl. ¶ 30. Her request was denied. Def. SMF ¶ 14. On February 26, 2008, Chief Vento rated Newton "unsuccessful" in her 2007 annual review, subjecting Newton to the implementation of a Performance Improvement Plan ("PIP"). Def. SMF ¶ 12; Newton Decl. ¶ 23. On April 23, 2008, Newton filed a "Request for Counseling" with the Office of Compliance alleging unlawful racially discriminatory practices and a hostile work environment. Def. SMF ¶ 16.

On May 19, 2008, Newton applied for participation in an "Alternate Work Schedule" program, which Chief Vento denied on May 21. Def. SMF ¶¶ 14–15; Newton Decl. ¶¶ 34–35. The following day, Director Tiscione also denied Newton's participation "based on performance issues." Def. SMF ¶ 16; Newton Decl. ¶ 36.

On June 6, 2008, Chief Vento rescinded the "unsuccessful" rating in Newton's 2007 annual review and changed it to "fully successful." Def. SMF ¶ 17. Chief Vento also withdrew Newton's PIP because Chief Vento "did not perform the implementation of the PIP in a timely manner." Vento Decl. ¶ 19. Instead, that day Chief Vento placed Newton on a "work plan." Def. SMF ¶ 18; Newton Decl. ¶ 39. On June 30, 2008, Newton filed a second "Request for Counseling" with the Office of Compliance alleging a new round of unlawful racially discriminatory practices, retaliatory employment practices, and a hostile work environment. Def. SMF ¶ 19.

In July 2008, Newton was diagnosed with job-related depression, anxiety, insomnia and stress and took medical leave. Def. SMF ¶ 20. She concurrently filed a claim under the Federal Employment Compensation Act (FECA) alleging various "stressors" including "too much work for one person." Def. SMF ¶ 22; Def. Ex. 4, at 5. Her FECA claim also alleged that "[t]he stress of a hostile work environment and discrimination has caused me to become very ill." Def. SMF

¶ 23; Def. Ex. 4, at 13.  As support for this statement, Newton presented an extensive list of her retirement services and clerical duties.  Def. SMF ¶ 23, Def. Ex. 4, at 13–18.  Newton remained on medical leave from July 2008 until February 2009.  Def. SMF ¶ 25.

## II.   STANDARD OF REVIEW

Defendant OAC has moved for judgment on the pleadings or, in the alternative, summary judgment.  Def. Mot. Summ. J. [20] 1.  Because the Court relies on materials outside of the pleadings, the Court will consider the motion as one for summary judgment.  *See* Fed. R. Civ. Pro. 12(d).

The Federal Rules of Civil Procedure state that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The standard requires more than the existence of *some* factual dispute: "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247–48 (1986).  A fact is material if, under the applicable law, it could affect the outcome of the case.  *Id.*  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  Also, because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

A non-moving party, however, must establish more than "the existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  Furthermore, it may not rely solely on allegations or conclusory statements.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  To avoid summary judgment, the non-moving party must present specific facts that could enable a reasonable jury to find in its favor.  *Id.*  However, if the evidence presented is "merely

colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50.

## III.    ANALYSIS

OAC moves for summary judgment on all of Newton's claims.  Def.'s Mot. Summ. J. [20] 36–37.  As to her discrimination claims, OAC argues that she has failed to proffer sufficient evidence to undermine the OAC's legitimate business reasons for its decisions and that Newton has no evidence that her termination was racially motivated.  *Id.*  As to her hostile work environment claims, OAC argues that Newton's evidence demonstrates mere "isolated incidents," not the severe and pervasive conduct required to show a hostile work environment. *Id.* at 31.  Finally, as to her retaliation claims, OAC argues that Newton has failed to establish a prima facie case of retaliation and to rebut the OAC's proffer that legitimate reasons—not retaliation—motived its actions.  *Id*. at 17–24.  Newton counters that summary judgment is inappropriate because a reasonable jury could conclude that the OAC's proffer is merely a pretext for prohibited racial discrimination and retaliation, and that she has presented sufficient evidence to establish her claims for a hostile work environment.  Pl.'s Opp'n [22] 18–37.  The Court will discuss these and other arguments in the analysis that follows.

### A.    Discrimination

Newton brings eight discrimination claims against OAC under the Congressional Accountability Act, 2 U.S.C. 1311(a)(1) ("CAA") (Counts I–III, V, VII, IX, XI, XIII).  Pursuant to the CAA, OAC employees are to be free from any discrimination based on race.  2 U.S.C. §§ 1301(3)(F), 1311(a)(1).  Racial discrimination under the CAA is the same as discrimination "within the meaning of section 703 of the Civil Rights Act of 1964."  § 1311(a)(1).  Therefore,

courts apply the traditional Title VII framework outlined by the D.C. Circuit in *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (2008).[2]

In the usual cases, where (as here) an "employer has asserted a legitimate, non-discriminatory reason for the decision, . . . the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason *and* that the employer intentionally discriminated against the employee on the basis of race, color, sex, or national origin . . . ." *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1246 (D.C. Cir. 2011) (quoting *Brady*, 520 F.3d at 494 (D.C. Cir. 2008)) (emphasis added).

This burden can be met by, *inter alia*, showing that the reason offered by the defendant is false, or by presenting sufficient evidence to permit a reasonable fact-finder to conclude that the employer's proffered explanation is "unworthy of credence." *Beyah v. Dodaro*, 666 F. Supp. 2d 24, 32 (D.D.C. 2009) (citing *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) and *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008)).   However, when the employer's proffered explanation is reasonable in the light of the evidence, "there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts, and summary judgment is appropriate." *Beyah*, 666 F. Supp. 2d at 32 (citations and quotations omitted).

Newton claims that the OAC discriminated against her on the basis of her race by denying her a noncompetitive promotion pursuant to her "career ladder" position (Count I), denying her a noncompetitive promotion due to an accretion of duties (Count II), refusing to compensate her for her performance of higher graded duties (Count III), placing her on a "work plan" (Count V), depriving her of her "entitlements" under HRMD Manual Chapter 430 (Count

---

[2] Newton contests whether the Title VII "adverse action" standard is appropriate to apply in the CAA context. Pl. Op. 13–18; Def. Reply 3 n.2. However, because the OAC proffers legitimate, non-discriminatory reasons for its actions, the Court moves directly to the *Brady* inquiry and need not examine which "adverse action" standard applies. *Brady*, 520 F.3d at 494.

VII), placing her under "heightened scrutiny (Count IX), constructively demoting her (Count XI), and denying her an alternative work schedule (Count XIII). Assuming *arguendo* that each of these actions qualifies as "adverse," the Court finds that Newton has failed to "produce sufficient evidence that [her] employer's asserted legitimate non-discriminatory reason[s] . . . [were] not the actual reason[s] and that [she] suffered discrimination on an impermissible ground." *Baloch v. Kempthorne*, 550 F.3d 1191, 1197 (D.C. Cir. 2008). Accordingly, summary judgment shall be granted in favor of the OAC with respect to all of Newton's discrimination claims.

### 1.      Failure to Promote pursuant to "Career Ladder"

Newton's first claim (Count I) is that the OAC racially discriminated against her by refusing to noncompetitively promote her pursuant to her "career ladder" position. Compl. ¶¶ 54–58. The OAC advances at least two legitimate, non-discriminatory reasons that Newton was not promoted: (1) her position was ineligible for noncompetitive promotion, and (2) a GS-13 retirement specialist was not needed. Def. Reply [25] 3–4. Because the OAC has advanced these reasons, under *Brady* Newton must produce evidence sufficient for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason *and* that the employer intentionally discriminated against the employee on the basis of race. 520 F.3d at 494 (emphasis added).

Newton first introduces evidence to attack the premise that she was ineligible for noncompetitive promotion because she was not placed in a "career ladder." Newton argues that she was told by Chief Wennerstein and Director Tiscione that her GS-12 position would be reclassified as "career ladder" after the HRMD reorganization in October 2006. Pl. Op. [22] 20–21. The primary significance of holding a "career ladder" position is that the occupant becomes eligible for noncompetitive promotion to a higher grade level. Def. Ex. 7 [27-1], at 47. As

support for her argument, Newton relies on the minutes from the Employee Benefits & Services

Branch meeting of January 18, 2008.  Pl. Ex. 15 [22-1].  The minutes contain the following

unattributed excerpt:

- Promotions Requested

. . . .

*Response:*
Margaret's position has promotion potential to the GS-13.  Consideration for
promotion is based on the level of duties performed and an evaluation of the
manner in which they are performed.  Becky [Vento] will develop criteria for
promotion.

*Id.* at 3.  Newton argues that this excerpt, in addition to her own testimony, is sufficient evidence

to convince a reasonable jury that she was moved into a "career ladder" position after the

reorganization.

The OAC responds that Newton "misinformed" Chief Vento that her position was "career

ladder" and that Vento later learned from Director Tiscione that Newton's position was in fact

not a "career ladder" position.  Vento Decl. ¶ 11.  Further, the OAC points out that the HRMD

Manual requires that (1) "[e]ntry into career ladder positions is subject to competition," (2)

"[c]areer ladder promotions are neither guaranteed nor automatic," and (3) "[t]he career ladder

must be documented on the position description and the Vacancy Announcement."  Def. Ex. 7

[21-7] 47–48.

In light of the OAC's evidence, a reasonable jury could not conclude that Newton was

eligible for a noncompetitive promotion under a "career ladder" position.  Newton relies only on

her own self-serving declaration and an unattributed statement from the minutes of an Employee

Benefits & Services Branch meeting.  Newton's assertions run smack into the HRMD Manual's

clear requirement that "entry into career ladder positions is subject to competition."  Def. Ex. 7

[21-7] 47.  Newton produces no evidence that she was competitively selected into a "career

ladder" position.   While Newton claims that Chief Wennerstein orally promised her a "career ladder" position, this is a far cry from Newton undergoing the formal, competitive process outlined in the HRMD Manual that is required to receive a "career ladder" position.   Newton also cannot claim ignorance of this competitive requirement—she was Human Resources Specialist and presumably familiar with the HRMD Manual.

Additionally, even if Chief Wennersten did promise Newton a "career ladder" position, Newton introduces no evidence that this promise was acted upon.   Newton's position description contains nothing mentioning that her position is "career ladder"—as the HRMD Manual requires.   *Id.* at 48.   Newton claims to be a "career ladder" employee but cannot produce a single personnel record from her years of employment that places her in such a position.   The unattributed excerpt from the January 18 meeting minutes that vaguely states that Newton "has promotion potential to the GS-13" hardly qualifies as a personnel record and is insufficient to overcome the clear requirements contained in the HRMD Manual for selection to a "career ladder" position.   Therefore, Newton has produced insufficient evidence from which a reasonable jury could find that the OAC's legitimate, non-discriminatory reason was false.

Even assuming *arguendo* that a reasonable juror could find that Newton held a "career ladder" position and that Newton met the criteria for promotion, the dispute over her eligibility to be noncompetitively promoted is a sideshow to the main area where Newton is lacking sufficient evidence.   Regardless of whether she officially entered a "career ladder" position in October 2006 and was eligible to seek a noncompetitive promotion, Newton fails to present any evidence that the OAC "intentionally discriminated against [her] on the basis of race." *Brady*, 520 F.3d at 494.   Although she never makes a clear argument supporting a claim of direct or indirect discrimination, Newton's claim appears to be for "disparate treatment"—that is, she believes that the OAC treated her less favorably than others because of her race. *See Int'l Bhd. of Teamsters v.*

*United States*, 431 U.S. 324, 335 n. 15 (1977).   In disparate treatment cases, "[p]roof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Id.* The latter cases, however, "are rare," and require a "stark" pattern "unexplainable on grounds other than race." *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

Newton's evidence purporting to establish a "stark" pattern of discrimination is this: two Caucasian Human Resources Specialists, Bowman and Smith, held GS-13 positions prior to leaving the OAC. *Brady* acknowledged that this is a tactic often used by employee/plaintiffs to prove pretext on the part of the employer/defendants. 520 F.3d at 495. For this tactic to succeed, however, the plaintiff and the comparator employees (in this case, Bowman and Smith) must be "similarly situated." *Id.* Regarding this "similarly situated" requirement, an inference of discrimination should not be drawn from disparate treatment of comparable employees unless "all of the relevant aspects of [his] employment situation [are] 'nearly identical'" to those of the comparator. *Neuren v. Adduci, Mastriani, Meeks, & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995); *Evans v. Holder*, 618 F. Supp. 2d 1, 11 (D.D.C. 2009). In addition, the Second Circuit has stated that "whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). However, in *Udoh v. Trade Ctr. Mgmt. Assocs.* this Court indicated that for a finding that two employees were similarly situated, a plaintiff must generally show that the more favorably treated coworker "dealt with the same supervisor, ha[s] been subject to the same standards and ha[s] engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." 479 F. Supp. 2d 60, 64 (D.D.C. 2007).

Newton has failed to introduce evidence sufficient for a reasonable jury to conclude that she is similarly situated to Smith and Bowman. The minimal record Newton has introduced

concerning Smith and Bowman can be summarized in two sentences:  Iris Smith, a Caucasian GS-13 Human Resources Specialist, left the OAC in April 2005.  Newton Decl. ¶ 4.  Karen Bowman, also a Caucasian GS-13 Human Resources Specialist, retired from the OAC in September 2006.  ¶¶ 5–8.  Worse still, Newton fails to argue that she is similarly situated to these individuals.   Instead, Newton includes a section in her opposition memorandum entitled "Relevant Chronology" where she includes a number of facts but never asks the Court to draw any conclusions about direct or indirect evidence of discrimination.  Pl. Opp'n [22] 20-22.  The Court will not do Newton's work for her and raise arguments where she has not done so.  *See Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1202, 179 L. Ed. 2d 159 ("Courts do not usually raise claims or arguments on their own.").

The most important facts for this case are those which Newton *does not* introduce about Smith and Bowman.  Newton introduces no evidence that the OAC hired Smith and Bowman as GS-12 employees and later noncompetitively promoted them to GS-13.  Newton introduces no evidence that Smith and Bowman "dealt with the same supervisor."  *Udoh*, 479 F. Supp. 2d at 64.  In fact, the evidence shows that Chief Wennersten served as the first-line supervisor to Smith and Bowman when they were GS-13 employees.  Chief Vento, however, supervised Newton when she requested her noncompetitive promotion to GS-13.  Newton Decl. ¶ 12.  Additionally, Newton presents no evidence that Smith and Bowman were "subject to the same standards" or that they ever requested noncompetitive promotions.  *Udoh*, 479 F. Supp. 2d at 64.  Newton has not met her burden to introduce any evidence that the OAC "intentionally discriminated against [her] on the basis of race."  *Brady*, 520 F.3d at 494.  Therefore, summary judgment in favor of the OAC on Count I is appropriate.

### 2.    Failure to Promote Pursuant to Accretion of Duties

Newton's second claim (Count II) is that the OAC racially discriminated against her by refusing to grant her an accretion of duties promotion to the GS-13 level.  The OAC again advances a legitimate, non-discriminatory reason that Newton was not promoted pursuant to an accretion of duties: she never performed GS-13 level work.  Because the OAC has advanced this reason, Newton must produce sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason *and* that the employer intentionally discriminated against the employee on the basis of race.  *Brady*, 520 F.3d at 494 (emphasis added).

First, Newton fails to introduce sufficient evidence that the OAC's legitimate, non-discriminatory reason for denying her an accretion of duties promotion—namely, that she never performed GS-13 level work—was not the actual reason.  Newton argues that she began performing GS-13 level work after the Employee Benefits & Services Branch reorganization in October 2006.  Pl. Op. [22] 23–24.  Newton heavily relies on an August 29, 2006, termination letter written by Stephen Ayers, the OAC's Chief Operating Officer, to Karen Bowman, then serving as a GS-13 Human Resources Specialist in the Employee Benefits & Services Branch.  Pl. Ex. 1.  In the letter, Ayers notifies Bowman that her GS-13 position has been abolished pursuant to a reorganization and that Bowman meets the requirements for "discontinued service retirement."  *Id.*  Ayers also states that "[t]he duties assigned to your position will be distributed to and performed by the remaining positions in the Employee Benefits & Services Branch."  *Id.*  Newton argues that this letter transferred Bowman's GS-13 duties "to . . . the remaining HR Specialist in the new and stand alone Employee Benefits & Services Branch, to wit: the Plaintiff."  Def. Op. [26] 21–22.

Newton overstates the significance of Ayers' letter.  The letter does not, as Newton claims, assign her GS-13 work.  The letter has nothing directly to do with Newton.  Instead, this

letter states the unsurprising fact that the work Bowman previously did would be reassigned to others within the Branch.  While it is undisputed that Newton was the only Human Resources Specialist in the Employee Benefits & Services Branch after the reorganization, the acting chief, Tiscione, stated that she never assigned any GS-13 work to Newton and that the GS-13 work "was either not needed at the time or performed by the new [GS-14] Branch Chief when she was hired."  Tiscione Decl. ¶ 18.   The OAC also conducted a neutral, third-party desk audit of her position that concluded that Newton's only duties were at the GS-12 level.  Def. Reply [25], at 4.  Absent Ayers' letter, which proves little, Newton has no evidence she performed GS-13 work other than her own unsubstantiated declaration.  As the D.C. Circuit has held, summary judgment "is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence . . . ."  *Arrington v. U.S.*, 473 F.3d 329, 342–43 (D.C. Cir. 2006) (quoting *Johnson v. Wash. Metro. Area Transit Auth.*, 883 F.2d 125, 128 (D.C. Cir. 1989)).

Second, even if Newton did perform GS-13 level work, another independent reason exists to grant summary judgment in favor of the OAC on Count II: Newton has not met her burden to introduce evidence that the OAC "intentionally discriminated against [her] on the basis of race." *Brady*, 520 F.3d at 494.  On this *Brady* prong, Newton encounters the same obstacle that she does on Count I—Newton cannot show that she is similarly situated to Smith and Bowman.  As previously discussed, simply showing that white co-workers were GS-13 employees does not allow an inference that the OAC discriminated against Newton based on her race.

Newton's other "arguments" in this section of her opposition memorandum border on incoherent—they are more akin to random statements of fact than actual arguments.  For example, Newton advances the following non sequitur: "Defendant cannot deny that Plaintiff

was not paid in accordance with the statutory mandate of Equal Pay for Substantially Equal Work for performing the higher graded GS-303-09 Building Inspector position." Pl. Opp'n to Def. Mot. for Summary J. [22] 23. The Court fails to see the relevance of this "building inspector" fact and fails to understand the system of mathematics that makes a GS-09 position higher graded than as GS-12 position.

Additionally, Newton summarizes her accretion of duties argument in the following way: "Accordingly, Defendant, has at all times therein, denied Plaintiff an 'accretion of duties' promotion and compensation in compliance with statutory mandate of Equal Pay for Substantially Equal Work." Pl. Opp'n 24. In addition to this sentence being grammatically incorrect and irrelevant, it identifies no racially discriminatory motive behind the OAC's actions. Because she has introduced no evidence that the OAC "intentionally discriminated against [her] on the basis of race," summary judgment in favor of the OAC is appropriate on Count II. *Brady*, 520 F.3d at 494.

### 3.    Remaining Discrimination Counts (III, V, VII, IX, XI, XIII)

Newton's remaining six counts of discrimination suffer the same fate as her first two— Newton introduces no evidence from which a reasonable jury could find a pattern of racial discrimination when the OAC allegedly refused to compensate Newton her for her performance of higher graded duties (Count III), placed her on a "work plan" (Count V), deprived her of her "entitlements" under Personnel Manual Chapter 430 (Count VII), placed her under "heightened scrutiny" (Count IX), constructively demoted her (Count XI), or denied her an alternative work schedule (Count XIII). *Arlington Heights*, 429 U.S. at 266.

One statement repeated throughout her opposition memorandum best illustrates Newton's lack of evidence: "Plaintiff submits that with all reasonable inferences drawn in her favor, the complaint contains enough facts to nudge her claims in Count[s] [III, V, VII, IX, XI, XIII] across

the line from conceivable to plausible pursuant to the adverse action standard respecting Title VII and the CAA." Pl. Opp'n 25–27, 30, 33–34. While such an argument is appropriate on a motion to dismiss or a motion for judgment on the pleadings, it fails to account for the fact that the OAC has brought a motion for summary judgment. Newton bears the burden on summary judgment to make more than plausible allegations; she must proffer "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . ." *Brady*, 520 F.3d at 494. Since Newton proffers no direct or indirect evidence that the OAC intentionally discriminated against her on the basis of her race, summary judgment on all discrimination counts is granted in favor of the OAC.

### B.     Hostile Work Environment

Newton also brings two claims for a hostile work environment under the CAA § 1311(a)(1) (Counts IV & XV). To make out a claim for a hostile work environment, Newton must demonstrate that she was subjected to discriminatory intimidation, ridicule, and insult that was so severe and pervasive that it altered the conditions of her employment and created an abusive working environment. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). In addition, the hostile work environment must be the result of discrimination based on a protected status. *Lester v. Natsios*, 290 F. Supp. 2d 11, 22 (D.D.C. 2003) (collecting cases). To determine whether a hostile work environment exists, courts look "to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008).

The D.C. Circuit has found that constant yelling and hostile behavior, and isolated references to a protected status may be insufficient to support a hostile work environment claim.

*George v. Leavitt*, 407 F.3d 405, 408, 416-17 (D.C. Cir. 2005), concluded that statements by three employees over a six-month period that the plaintiff should "go back where she came from," separate acts of yelling and hostility, and allegations that the plaintiff was not given the type of work she deserved were isolated instances that did not rise to the level of severity necessary to find a hostile work environment.  In *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 54-57 (D.D.C. 2004), the plaintiff's allegations that her employer humiliated her at meetings, screamed at her in one instance, told her to "shut up and sit down" in another instance, and treated her in a manner that was "constantly hostile and hypercritical" did not amount to a hostile work environment, even though these actions may have been disrespectful and unfair. Similarly, the fact that an employee and his immediate supervisor repeatedly "butted heads" and that the supervisor frequently yelled at the employee during discussions about his work and "threatened" job-related consequences for the employee's refusals to meet workplace expectations did not demonstrate a hostile work environment pervaded by discrimination. *Franklin v. Potter*, 600 F. Supp. 2d 38, 77-78 (D.D.C. 2009).  Moreover, *Hussain v. Gutierrez*, 593 F. Supp. 2d 1, 7 (D.D.C. 2008), concluded that "complaints over undesirable job responsibilities and office arrangements do not support a hostile work environment cause of action."

Newton's hostile work environment claims will be dismissed for three independent reasons.  First, Newton provides only an argument in opposition to defendant's motion to dismiss and no argument in opposition to defendant's motion for summary judgment.  Second, there is no evidence the OAC's conduct meets the legal standard of "severe and pervasive" conduct that alters the conditions of employment and creates an abusive working environment.  *Oncale*, 523 U.S. at 81.  Third, there is no evidence—direct or circumstantial—from which a reasonable jury could conclude that the conduct Newton complains of was motivated by her race.

To begin, Newton again makes no cognizable argument against summary judgment.  The argument section of her memorandum opposing summary judgment does three things—only the first of which is proper on summary judgment.  First, Newton cites various cases laying out the components of a hostile work environment claim.  Pl Op. [22] 26–27, 34–35.  The Court has no problem with this.  In fact, it is often helpful to the Court for parties to cite applicable legal standards in their briefs.

Second, Newton incorporates by reference the allegations contained in her Complaint and boldly contends that they "provide Plaintiff with the level necessary to support a hostile work environment claim."  Pl. Opp'n at 27.  Relying on this conclusory tactic would be risky—at best—if plaintiff were opposing a motion for judgment on the pleadings.  However, plaintiff is also facing a motion for summary judgment.  The facts alleged in a complaint are not evidence for the purposes of a motion for summary judgment.  *See* Fed. R. Civ. P. 56(c)(1), (3).  Moreover, the D.C. Circuit has explained that "a district court should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis . . . ."  *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir.1996) (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir.1988), *cert. denied sub nom. Twist v. Thornburgh*, 490 U.S. 1066, 109 S. Ct. 2066, 104 L.Ed.2d 631 (1989)).

Third, Newton "submits that with all reasonable inferences drawn in her favor, the complaint contains enough facts to nudge her claims in Counts [IV and XV] across the line from conceivable to plausible pursuant to the adverse action standard respecting Title VII and the CAA."  Pl. Opp'n 27, 36.  As previously discussed, this is the incorrect standard for opposing summary judgment.  When a party files an opposition addressing only certain arguments raised in a dispositive motion, a court may treat those arguments that the non-moving party failed to

address as conceded.  *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (discussing Local Civil Rule 7.1(b)).

Next, even assuming *arguendo* that the conduct described by Newton occured, it does not meet the legal standard of conduct so "severe and pervasive" that it alters the conditions of employment and creates an abusive working environment.  *Oncale*, 523 U.S. at 81.  Anti-discrimination statutes are not "general civility code[s]" that permit recovery for "ordinary tribulations of the workplace."  *Faragher*, 524 U.S. at 788 (citations and quotations omitted).  Newton has the burden of presenting specific facts upon which a reasonable jury could conclude that his workplace was "permeated with discriminatory intimidation, ridicule, and insult . . . ."  *George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005) (quotations and citations omitted).

Newton's declaration describes only a series of "isolated instances"—namely, the denial of a promotion, her placement on a "work plan," and the denial of an alternative work schedule.  *Leavitt*, 407 F.3d at 408.  Further, her main concern was "[t]he unreasonable expectation of the amount that [she] was required to do."  Pl. Dep. 871:14-5 (Def. Ex. 5).  As support for her separate FECA claim, Newton presented an extensive list of her the retirement and clerical duties she performed.  Def. SMF ¶ 23, Def. Ex. 4, 13–18.  This evidence merely shows "complaints over undesirable job responsibilities" and her workload—nothing rising to the level of the "severe and pervasive" behavior necessary to create a hostile work environment.  *Gutierrez*, 593 F. Supp. 2d 1 at 7.  Newton presents no evidence of verbal abuse, intimidation, ridicule or insult.  Accordingly, Newton has failed to introduce sufficient evidence from which a reasonable jury could find that the OAC's actions created a hostile work environment.

Finally, there is no evidence—direct or indirect—from which a reasonable jury could conclude that the conduct Newton complains of was motivated by her race.  Newton's hostile work environment claims rely on the same "evidence" as her previously considered

discrimination claims—primarily her own declaration.   Again, as the D.C. Circuit has held, summary judgment "is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence . . . ." *Arrington v. U.S.*, 473 F.3d 329, 342–43 (D.C. Cir. 2006) (quoting *Johnson v. Wash. Metro. Area Transit Auth.*, 883 F.2d 125, 128 (D.C. Cir. 1989)).   Newton fails to argue that she is similarly situated to any individuals and fails to present other direct or indirect evidence of discriminatory motive. *See supra* Part III.A.1.   Because there is insufficient evidence for a reasonable jury to find that the hostile work environment was the result of discrimination based on a protected status, summary judgment for the OAC on all hostile work environment claims is appropriate.

## C.        Retaliation

Finally, Newton brings six retaliation claims under the CAA, 2 U.S.C. § 1317(a) (Counts VI, VIII, X, XII, XIV, and XVI).   To make out a claim for retaliation, a plaintiff must show that he or she engaged in statutorily protected activity, suffered an adverse employment action, and that there is a causal connection between the two.   *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003).   However, as with Newton's discrimination claims, since her former employer has asserted a legitimate, non-retaliatory reason for its actions, Newton must produce sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory reason was not the actual reason and the employer in fact intentionally retaliated against her because of her statutorily protected activity.   *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).   The only issue, then, is whether the employee's evidence "creates a material dispute on the ultimate issue of retaliation either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."   *Id.* (citations and quotation marks omitted).

Newton's retaliation claims fail because she has failed to produce sufficient evidence for a reasonable jury to find that the OAC's asserted, non-retaliatory reason for its actions was not the real reason and that the OAC actually terminated her because she engaged in statutorily protected activity. *See Jones*, 557 F.3d at 678. Nothing Newton presents suggests either that a retaliatory reason motivated the OAC or that the reasons the OAC has put forward shouldn't be credited. *See id.*

### 1. Counts VI, VIII, X and XII

Newton argues that illegal retaliation was involved in the following three actions: (1) her placement on a "work plan," (Count VI), (2) the OAC depriving Newton of her "Chapter 430 entitlements" (Count VIII), and (3) placing her on "heightened scrutiny" (Count X). Pl. Opp'n 27–30. The OAC argues that the legitimate, non-retaliatory reason for its actions was that Newton was experiencing difficulties performing her GS-12 duties. Def. Reply at 9. Newton argues that this was mere pretext because the "work plan" was issued approximately six weeks after Newton filed her first request for counseling and was issued in violation of HRMD Manual Chapter 430. Pl. Opp'n at 29.

To understand these arguments, it is necessary to review the relevant timeline of events. On February 26, 2008, Rebecca Vento gave Newton an "unsuccessful" rating in her 2007 annual review. Def. Stmt. ¶ 12; Compl. ¶ 27. This subjected Newton to the implementation of a PIP. *Id.* On April 23, 2008, Newton filed a "Request for Counseling" with the Office of Compliance—her protected activity. Def. Stmt. ¶ 13; Compl. ¶ 5. Because Vento "did not perform the implementation of the PIP in a timely manner" it never entered into force and on June 6, 2008, Vento rescinded the PIP and rated Newton "fully successful" for 2007. Vento Decl. ¶ 19. That same day, Newton argues that she was placed on a "work plan" in violation of Chapter 430. Pl. Opp'n at 28.

Newton asserts that the "'work plan' was a code word for a PIP." Pl. Opp'n 29. This statement highlights the illogic of her position. If the work plan is a PIP renamed, the OAC did not treat Newton any differently *before* her protected activity than it did *after* she engaged in her protected activity. Prior to her Request for Counseling, she was subject to a PIP; after her Request for Counseling, she was subject to a "work plan."

The same timing problem is also fatal to Newton's claim (Count XII) for retaliation based on "constructive demotion." Newton alleges that she should have been treated as a GS-13 employee after September 6, 2006. Compl. ¶ 39. Chief Vento notified Newton that she would not receive a promotion to GS-13 in January 2008. Def. SMF ¶ 11. Newton did not undertake a protected activity until April 23, 2008, when she filed her Request for Counseling with the Office of Compliance. Def. SMF ¶ 13. After the Request for Counseling, Newton maintains that she still should have been treated as a GS-13 employee. Compl. ¶ 39. Again, the OAC did not treat Newton any differently *before* her protected activity than it did *after*. Therefore, Newton fails to present any evidence from which a reasonable jury could conclude that there is a causal connection between the activities described in Counts VI, VIII, X, & XII and her protected activity, and fails to rebut Newton's legitimate, on-discriminatory reason for acting—that Newton was struggling to perform her GS-12 duties.

Additionally, Newton has no evidence that a retaliatory reason motivated the OAC for taking these actions. *Jones*, 557 F.3d at 678. The person taking the allegedly retaliatory actions must have knowledge of the protected activity in order to retaliate for the activity. *Id.* at 679 ("[W]e agree that Jones' supervisors could not have retaliated against him unless they had knowledge of his protected activity."). Newton's first-line supervisor Chief Vento issued the "work plan" and would have been the person to constructively demote Newton, but Newton proffers no evidence that Chief Vento had any knowledge of her filing the Request for

Counseling. Because of this, Newton has failed to introduce evidence from which a reasonable jury could conclude that the OAC had a retaliatory motive for its actions.

### 2.    Count XIV:  Retaliatory Denial of an Alternative Work Schedule

Newton argues that illegal retaliation was involved in the OAC's decision to deny her an alternative work schedule (Count XIV). Pl. Opp'n 33–34. The OAC argues that the legitimate, non-retaliatory reason for its actions was that Newton did not qualify for inclusion in the program for performance reasons. Def. Reply 7. Newton argues that this was mere pretext because the "unsuccessful" performance rating that made her ineligible to receive an alternative work schedule was later withdrawn. Pl. Opp'n 34; Compl. ¶ 44.

On February 26, 2008, Newton received an "unsuccessful" performance rating. Def. SMF ¶ 12. She then filed her Request for Counseling on April 23, 2008. Def. SMF ¶ 13. On May 19, 2008, Newton applied for participation in an alternative work schedule. Def. SMF ¶ 14. This request was denied on May 21 by Chief Vento and on May 22 by Director Tiscione. Def. SMF ¶¶ 15–16. It is undisputed that this denial was based on the "unsuccessful" rating and that the "unsuccessful" rating in fact rendered Newton ineligible for an alternative work schedule. Compl. ¶ 44; Def. SMF 16.

Timing remains the issue. Because the February 2008 "unsuccessful" rating rendered Newton automatically ineligible for an alternative work schedule, and this rating was given before Newton undertook her protected activity, there is no causal connection between Newton's protected activity and the denial of the alternative work schedule. Even though the "unsuccessful" rating was later rescinded, this has no bearing on the fact that at the time the allegedly retaliatory action was taken the "unsuccessful" rating was dispositive of her request for an alternative work schedule. Further, Newton fails to present evidence that either Chief Vento or Director Tiscione knew of her protected activity when they denied her the alternative work

schedule.  Newton has failed to introduce evidence from which a reasonable jury could conclude that the OAC had a retaliatory motive for its actions and failed to rebut the OAC's legitimate, non-retaliatory reason for denying the alternative work schedule.

### 3.      Count XVI: Retaliatory Creation of a Hostile Work Environment

Newton's final claim (Count XVI) is that the OAC subjected her to a hostile work environment in retaliation for her involvement in protected activity.  In order to prove this, Newton must, *inter alia*, introduce sufficient evidence for a reasonable jury to find that a she was "subjected to discriminatory intimidation, ridicule, and insult of such severity or pervasiveness as to alter the conditions of her employment and create an abusive working environment." *Na'im v. Clinton*, 626 F. Supp. 2d 63, 79 (D.D.C. 2009).  This Court dismissed Newton's hostile work environment claims for three independent reasons: (1) Newton provides only an argument in opposition to defendant's motion to dismiss and no argument in opposition to defendant's motion for summary judgment; (2) Newton presents insufficient evidence that the OAC's conduct meets the legal standard of "severe and pervasive" conduct that alters the conditions of employment and creates an abusive working environment, *Oncale*, 523 U.S. at 81; (3) Newton presents insufficient evidence—direct or circumstantial—from which a reasonable jury could conclude that the conduct Newton complains of was motivated by her race.  *See supra* Part III.B. Because these previously addressed concerns apply with equal force to Newton's Count XVI claim, that claim must fail as well.

For these reasons, the Court will grant the OAC's Motion for Summary Judgment as to Counts VI, VIII, X, XII, XIV and XVI of Newton's Complaint.

## IV.    CONCLUSION

Therefore, for the reasons stated above, the Court will grant defendant's Motion [20] for Summary Judgment.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Chief Judge Royce C. Lamberth on 3/12/2012.